Lloyd H. Walker and Gretchen C. Walker v. Commissioner.
Walker v. Commissioner
Docket No. 43400.
United States Tax Court
T.C. Memo 1954-71; 1954 Tax Ct. Memo LEXIS 173; 13 T.C.M. (CCH) 558; T.C.M. (RIA) 54177; June 21, 1954, Filed *173 Harold A. Pebbles, Esq., and C. L. Stickney, C.P.A., 521 Security Building, Olympia, Wash., for the petitioners. John H. Pigg, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax against petitioners for the taxable years 1947, 1948, and 1949 in the respective amounts of $299.82, $307.22, and $285.04. The sole issue is whether the sum of $8,000, representing part of the purchase price paid upon the acquisition of an insurance and bonding business, is depreciable over the 5-year period of a covenant not to compete. Findings of Fact Some of the facts were stipulated and they are hereby found. Lloyd H. Walker, hereinafter referred to as petitioner, and Gretchen C. Walker are husband and wife. They reside in Olympia, Washington and filed a joint income tax return for each of the taxable years with the then collector of internal revenue for the district of Washington. During the taxable years petitioner was engaged in the casualty and fire insurance business in Olympia under the trade name of Lindley Insurance Agency. This business was acquired by petitioner in 1945 under circumstances *174 hereinafter related. On June 21, 1945, petitioner agreed to purchase from one Harry R. Lindley an insurance and bonding business known as the Harry Lindley Agency located in Olympia. Pertinent provisions of the contract, in which Lindley and petitioner are designated as first and second parties, respectively, are as follows: "(1) The purchase price shall be in the sum of Ten Thousand ($10,000) Dollars, Three Thousand ($3,000) Dollars to be paid upon the execution hereof, receipt whereof is hereby acknowledged, and One Hundred ( $100) Dollars or more, plus interest at the rate of four per cent per annum, computed from the first day of August 1945 to be paid the first day of September 1945, and One Hundred ( $100) Dollars or more plus interest at said rate upon the unpaid balance to be paid on or before the first day of each and every month thereafter until said unpaid balance shall have been fully paid and satisfied, * * * "(2) It is the understanding and agreement by and between the parties hereto that the within transfer contemplates an insurance and bonding business only, together with office equipment and supplies, party of the first part reserving, however, office space *175 and the use of equipment for the transaction of his real estate and personal business not in conflict with the foregoing transfer, * * * "(3) It is further understood and agreed that said business shall be conducted under the name of Harry Lindley Agency. "(4) It is the object of the parties hereto that party of the first part in addition to conveying the business hereto transfers all of the good will of said business which might obtain and in furtherance thereof and hereby agrees to extend to party of the second part all insurance business which might arise by virtue of his real estate business, * * * "(5) It is agreed by and between the parties hereto that party of the second part shall extend to party of the first part all real estate transactions and business other than insurance which might be presented by the maintenance and operation of said business, and party of the first part is not to enter into a like, similar, or competitive business for a period of five years from the date of execution hereof." At the time of the sale Lindley had an annual volume of premiums around $40,000. The $10,000 purchase price was arrived at by adding the value of the tangible assets to *176 an estimate of policy renewals figured at about 20 per cent. The insurance business purchased consisted almost entirely of fire and casualty insurance, the fire insurance being about two and one-half times the volume of the casualty insurance business. The bonding business was about one to two per cent by volume. By reason of his employment with the Northwestern Mutual Fire Association of Seattle prior to the execution of the 1945 purchase contract, petitioner was familiar with the insurance business then being carried on by Lindley, including the agency and insurance contracts then in force, its list of some 1,600 customers, and the estimated future earnings capacity of the business. Petitioner had the covenant not to compete placed in the purchase contract and he would not have purchased the business without it. After the purchase transaction of June 21, 1945, petitioner and Lindley operated their respective insurance and real estate businesses in the same location under the name of Harry Lindley Agency. Because of confusion which arose in connection with their bank accounts, they agreed shortly thereafter that petitioner's insurance business should be operated under the name *177 of Lindley Insurance Agency. About a year later, Lindley told petitioner that he intended to enter into a competitive business upon the expiration of the 5-year restrictive agreement. In 1949, more than a year prior to the expiration of the 5-year covenant period, petitioner moved his office to another location. Soon thereafter Lindley brought suit against petitioner for increased operating expenses resulting from petitioner's moving. The principal matter litigated was petitioner's right to continue the use of the name of "Lindley" in connection with his insurance business. The court decided this in petitioner's favor. Soon after petitioner moved, Lindley brought in a real estate salesman who obtained an insurance license. An insurance business was then carried on at the old address. During the 5-year period immediately following the execution of the purchase contract, petitioner's business increased. In June 1950, he still had 378 of Lindley's old customers, or policy holders. The tangible and intangible assets acquired by petitioner under the contract consisted of (a) office equipment and supplies; (b) an established insurance business, including agency contracts subject *178 to a 30-day cancellation privilege; (c) insurance contracts then in force; (d) a trade name; (e) a list of names of approximately 1,600 customers; (f) good will; and (g) the agreement of Lindley, the seller, that he would not enter into a like, similar or competitive business for the next 5 years. The restrictive agreement was placed in the contract for the purpose of protecting petitioner in his purchase of the insurance business. At the time of the sale Lindley had agency contracts with the Northwestern Mutual Fire and Northwestern Casualty Company and the Preferred Accident Company. At the time of the hearing the Northwestern Mutual Fire and Northwestern Casualty Company was petitioner's main agency, 90 per cent of his volume being with that company. Of the $10,000 purchase price, petitioner, for Federal income tax purposes, allocated $2,000 to furniture and fixtures, and the balance, $8,000, to the covenant not to compete. In their joint return for each of the taxable years 1947, 1948, and 1949, petitioner and his wife claimed a deduction of $1,600, described therein as "Depletion of Contract," representing one-fifth of the $8,000 allocated by petitioner to the covenant not *179 to compete. Respondent disallowed each of the deductions so claimed. The intangible assets acquired by petitioner had no definite life. The contract under which Lindley's agreement not to compete was acquired by petitioner is not divisible as between the covenant and intangible assets, which are not depreciable. Opinion Petitioner contends that apart from tangible assets worth $2,000, the only thing of value acquired by him under the Lindley sales contract was the restrictive covenant. Cf. , affd. (C.A. 10) . Petitioner is mistaken. According to petitioner's own testimony, the $10,000 purchase price was arrived at by assuming that he would be able to write the policy renewals for 20 per cent of Lindley's old customers. Petitioner acquired a list of 1,600-odd customers, of whom 378 are still retained by him; the trade name of "Lindley" which he continued to use; and the Northwestern Mutual Fire and Northwestern Casualty agency which today makes up 90 per cent of his volume. [1] It is plain that the contract, unlike , involved primarily the sale of a going business, *180 including good will. Cf. , affd. (C.A. 10) ; . That the covenant not to compete was inserted in the sales contract, not as a separate item, but rather to protect these intangible assets appears from the testimony of petitioner's own opinion witness. [2] Under the circumstances, we think this case is indistinguishable from , where we said: "* * * any value applicable to the covenant not to compete is nonseverable from the entire transaction which consisted of acquisition by petitioner of a capital asset together with a covenant which protected his beneficial enjoyment of that asset. * * *" *181 See also George H. Payne, 22 T.C. - (June 9, 1954); ; , affd. (C.A. 6) , certiorari denied . Accordingly, the deductions for depreciation of the covenant as though it were a severable asset were properly disallowed. Decision will be entered for the respondent. Footnotes
1. Petitioner testified as follows: Q. You were interested in the agency contracts that Mr. Lindley had at that time, were you not? A. Only one company, yes, the Northwestern. Q. But you wanted that one? A. Definitely. Q. You also wanted the list of customers, or policy holders he had, some sixteen hundred? A. That is right. ↩
2. Tom R. Gerdes, field representative for the Northwestern Mutual Fire and Northwestern Casualty Company, testified: Q. You heard Mr. Walker's testimony as to the approximate volume, annual volume, of business being done at that time, prior to the sale, approximately $40,000? A. Yes. Q. Would you say that the prospect of keeping the insurance business with $40,000 annual premiums, at twenty percent in your commissions had some value for a prospective and future business in carrying on the same business? A. That would depend on your agreement, whether or not the man selling that to him was going to continue in the business or not. Q. Is that not the reason he put this covenant not to compete into this contract? A. That is right.↩